IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELMER A. GALVAN JIRON, #332595      *
      Plaintiff,
  v.                                  *   CIVIL ACTION NO. ELH-16-3491

DR. JASON CLEM                        *
WEXFORD MEDICAL COMPANY
      Defendants.                *
                        *****

## MEMORANDUM OPINION

On October 20, 2016, plaintiff Elmer Galvan Jiron,[1] a self-represented inmate incarcerated at the Eastern Correctional Institution ("ECI"), filed a civil rights action against Wexford Health Sources, Inc. ("Wexford"), the private health care contractor serving inmates in the Maryland Department of Public Safety and Correctional Services, and Dr. Jason Clem, the Medical Director at ECI (hereinafter, "Medical Defendants"). In the suit, filed pursuant to 42 U.S.C. § 1983, plaintiff seeks monetary compensation and injunctive relief, *i.e.*, referral to an eye specialist and enforcement of all instructions and prescribed medicines. ECF 1 at 4.

The Medical Defendants have filed a motion to dismiss or, in the alterative, a motion for summary judgment. ECF 10. It is supported by a legal memorandum (ECF 10-3)[2] (collectively, "Motion") and a number of exhibits.[3] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d

---

[1] Plaintiff refers to himself as Elmer A. Galvan Jiron. However, the Maryland Department of Public Safety and Correctional Services ("DPSCS") lists plaintiff as Elmer Antonio Galvangiron on its "inmate locator" website.

[2] All exhibits are referenced by their electronic filing number.

[3] The sealed medical record, at ECF 12, is 56 pages in length.

309 (4th Cir. 1975), on January 11, 2017, the Clerk of Court informed Galvan Jiron that defendants had filed a dispositive motion; that Galvan Jiron had seventeen days in which to file a written opposition; and that if he failed to respond, the claim against Wexford and Clem could be dismissed, without further notice. ECF 13. Galvan Jiron was granted two extensions of time in which to respond, and he filed an opposition on April 3, 2017 (ECF 19, "Opposition"), along with exhibits, including his own Affidavit. ECF 19-1 at 3-4. The Medical Defendants filed a reply. ECF 20.

The matter is ready for disposition, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016). For the reasons that follow, I shall construe the Motion as one for summary judgment and GRANT it.

### I. Factual Background

Galvan Jiron alleges that on or about June 11, 2014, he began to experience a severe eye disorder, resulting in his referral to an eye specialist, "Dr. Summerville." The doctor performed an operation and prescribed specific medicine and instructions to be carried out by the medical department. Plaintiff complains that the medical department did not adhere to the instructions or provide prescribed items (sunglasses, pain medication, and eye drops), he was subjected to severe pain, and he is losing his vision. ECF 1 at 4. Further, plaintiff claims that he sought additional treatment from Dr. Clem and asserts that defendants have been deliberately indifferent to his medical needs. *Id.*

The Medical Defendants' materials indicate that Galvan Jiron is a 46-year old male with a medical history significant for pterygium,[4] esophageal disease, constipation, and backache.

---

[4] Pterygium is a growth of fleshy tissue. It can remain small or grow large enough to cover part of the cornea. It is believed to be caused by having dry eyes. The growth may also be

2

ECF 10-5, Clem Aff. Dated January 10, 2017[5] On April 30, 2014, while plaintiff was housed at North Branch Correctional Institution ("NBCI"), he was seen by an ophthalmologist, Dr. Michael Summerfield, due to Galvan Jiron's complaints concerning his right eye. *Id.* ¶ 5. Galvan Jiron reported that he was provided eye drops, but he was not taking them because they did not help. *Id.* His uncorrected vision in his right eye was 20/20 and 20/25 in his left eye. Dr. Summerfield recommended removal of the pterygium. Galvan Jiron was prescribed Visine-A[6] at that time. *Id.*

On June 11, 2014, Galvan Jiron was transferred to the Western Maryland Health System for pterygium removal, with autograft in the right eye, to be performed by Dr. Summerfield. *Id.* ¶ 6. Galvan Jiron was informed of the risks of the surgery, including blindness or loss of the eye. *Id.* A local anesthetic was injected and "the pterygium was excised in its entirety." *Id.* "A graft was then sewn into place over the excised defect." *Id.* Post-operative drops of Pred Forte and Vigamox[7] were applied and "the eye was patched and shielded." *Id.*; ECF 12 at 18-25. Galvan Jiron was taken to the recovery room. No new medications for the eye were prescribed. Dr. Summerfield was to see Galvan Jiron the following day. ECF 10-5, ¶ 6; ECF 12 at 28-33.

---

caused by exposure to wind, dust, and ultraviolet (UV) light from the sun. *See* https://www.aao.org/eye-health/diseases/pinguecula-pterygium.

[5] Dr. Clem is a licensed physician who serves as the Regional Medical Director for Wexford. ECF 10-5, ¶¶ 1, 20.

[6] Visine A is used to temporarily relieve itchy, red eyes caused by allergies to things such as pollen, ragweed, grass, or animal hair and dander. *See* https://www.drugs.com/cdi/visine-a.html

[7] Pre Forte drops are used for treating inflammation of the eyes and eyelids due to certain conditions. It is an ophthalmic corticosteroid. *See* https://www.drugs.com/cdi/pred-forte-drops.html. Vigamox is a quinolone antibiotic used for eye infections. *See* http://www.webmd.com/drugs/2/drug-75149-3321/vigamox-drops/details.

Galvan Jiron was returned to the Western Correctional Institution on June 12, 2014, and admitted to the infirmary for twenty-four-hour observation. ECF 10-5, Clem Aff., ¶ 7; ECF 12 at 1. He was seen by Delores Adams, R.N., that same day for a complaint of discomfort in his right eye associated with photophobia (abnormal intolerance to light). ECF 10-5, ¶ 7. Adams was unable to inspect the eye due to Galvan Jiron's refusal to open it. *Id.* Galvan Jiron denied nausea, was able to ambulate independently, and was able to perform his daily living activities without assistance. *Id.*; ECF 12 at 2-3.

Galvan Jiron was also seen by Dr. Summerfield on June 12, 2014. ECF 10-5, ¶ 8. The ophthalmologist noted that Galvan Jiron's right eye was in "'excellent condition'" and that his uncorrected visual acuity for his left eye was 20/60. *Id.* Dr. Summerfield noted that plaintiff was ready to be discharged from the infirmary and returned to general population at NBCI. *Id.*; *see also* ECF 12 at 36.

On June 14, 2014, Galvan Jiron was seen by Dr. Colin Ottey for a provider visit related to his recent eye surgery. ECF 10-5, ¶ 9. He reported pain and blurred vision. Dr. Ottey noted that Galvan Jiron was photophobic and that he would discuss Galvan Jiron's symptoms with Dr. Summerfield. *Id.* He ordered Galvan Jiron medically assigned to receive meals in his cell for two weeks. *Id.*; ECF 12 at 6-7. On June 18, 2014, Galvan Jiron was provided a bottle of artificial tears by Kristi Cortez, R.N. ECF 12 at 6-8.

On June 26, 2014, Galvan Jiron was seen by Nurse Practitioner Janette Clark for complaints of eye pain. ECF 12 at 9-11; ECF 10-5, ¶ 10.[8] She noted that Galvan Jiron had recently had surgery on his right eye and that his sclera was reddened. In addition to his Visine-

---

[8] Clem's Affidavit indicates that plaintiff was seen by Nurse Clark on June 25, 2014. However, the medical record states the date of June 26, 2014. The discrepancy is not material.

A, Galvan Jiron was prescribed Pred Forte and artificial tears. His feed-in medical assignment was extended for thirty days, he was provided an eye patch, and he was instructed to tape the eye shut while wearing the patch. Galvan Jiron was referred to Dr. Summerfield for a follow-up visit. ECF 10-5, Clem Aff., ¶ 10; ECF 12 at 9-11.

Dr. Summerfield saw plaintiff on July 9, 2014. ECF 10-5, ¶ 11. His uncorrected visual acuity in the right eye was 20/200 and 20/20 in his left eye. *Id.* The corrected vision in the right eye was 20/25. *Id.* Dr. Summerfield noted that Galvan Jiron's right eye was "doing well." *Id.*; ECF 12 at 37. Moreover, his "poor visual acuity in his right eye was an expected temporary result" of the surgery. ECF 10-5, ¶ 11.

Dr. Summerfield again examined plaintiff on August 13, 2014. ECF 10-5, ¶ 13; ECF 12 at 38. His uncorrected visual acuity in his right eye was 20/30 and it was 20/20 in left eye. *Id.*; ECF 12 at 38.

On August 28, 2014,[9] Galvan Jiron was examined by the prison optometrist for eyeglasses. His uncorrected visual acuity was 20/40 in his right eye and 20/25 in his left eye. His corrected visual acuity in both eyes was 20/25. A prescription for glasses was submitted. ECF 12 at 39-40; *see also* ECF 10-5, ¶ 12.

On January 15, 2015, and again on April 21, 2015, plaintiff was seen by the prison optometrist. His corrected vision in both eyes was 20/20. *Id.* ¶¶ 15, 16. There was no notation that he complained of eye pain during the optometry visits. *Id.*; ECF 12 at 46-49.

---

[9] Dr. Clem avers that the date was August 8, 2014. Presumably, that was a typographical error. In any event, the discrepancy is not material.

The Medical Defendants allege that Galvan Jiron "voiced no complaints related to his eye between August 13, 2014 and June 4, 2015," when he submitted a sick-call slip complaining of eye pain. ECF 10-5, Clem Aff., ¶ 14.

On June 8, 2015, Galvan Jiron was seen by Physician's Assistant Kelly Murray for complaints related to eye pain and other issues. ECF 10-5, ¶ 17. In particular, he complained that he was having difficulty reading with his new glasses, indicating that the eyeglasses caused his left eye to strain while reading. He was referred to the optometrist. *Id.* He was seen by the prison optometrist on July 14, 2015. *Id.* ¶ 19. His corrected vision was 20/25 in both eyes. *Id.*; ECF 12 at 50-52.

On or around November 6, 2015, Galvan Jiron was transferred to ECI. The day after plaintiff's arrival at ECI Galvan Jiron was seen by the prison optometrist for complaints of blurry vision. His corrected vision was 20/25 in both eyes. His eyeglass prescription was updated and he was issued new prescription glasses soon after. *Id.*, ¶ 21; ECF 12 at 53-54.

Galvan Jiron submitted a request to see the optometrist on June 26, 2016, because his eyes were burning. ECF 20-1 at 6. He reported that he had eye surgery two years earlier and said: "I haven't seen the optometrist at all." *Id.* He submitted another request to see the optometrist on September 4, 2016, because he claimed his vision was getting worse. *Id.* at 7. He was seen by Melissa Richbank, R.N., on September 10, 2016. ECF 20-1. And, Sheila Kerpelman, N.P. also saw plaintiff on November 4, 2016, for matters unrelated to his eyes. ECF 20-2 at 2-4. On November 7, 2016, Galvan Jiron was seen by the optometrist for a complaint of

blurry vision. His vision was evaluated and found to be 20/25 in both eyes. The optometrist did not refer Galvon Jiron to an ophthalmologist.[10]

On February 4, 2017, Galvan Jiron was seen at sick call for his complaint of pain and pressure to his right eye when leaning over. ECF 20-2 at 5-6. He was referred to an optometrist. *Id.* at 6. On March 3, 2017, Galvan Jiron was seen by Registered Nurse Kerpelman. No exophthalmos[11] was observed, his pupillary reaction was found to be normal, and his extraocular movements were found to be intact. ECF No. 20-2.

Notably, on July 11, 2014, about a month after his eye surgery, plaintiff filed a Request for Administrative Remedy ("ARP") with the Maryland Division of Correction. ECF 19-1 at 1. He complained that he did not receive an eye patch, eye drops, and pain medicine. *Id.* The Warden responded on November 7, 2014. *Id.* at 2. The Warden found that the ARP was "meritorious in part" because Dr. Summerfield ordered eye drops on June 12, 2014, but they were not provided. And, an eye patch was not ordered until June 25, 2014, although it was received on that date. *Id.* Eye drops were again ordered by Dr. Summerfield on June 25, 2014, and plaintiff signed for them on June 27, 2014. *Id.*

Dr. Clem opines that the post-surgical care provided to plaintiff was in accordance with the recommendations of Dr. Summerfield. In addition, he opines that the care provided to plaintiff was medically appropriate. ECF 10-5, ¶¶ 23, 24.

---

[10] Curiously, Dr. Clem avers that, since plaintiff's transfer to ECI, he has "voiced no complaints of eye issues" to Dr. Clem or to any other ECI medical staff. ECF 10-5, Clem Aff., ¶ 20. The Medical Defendants also assert that Galvan Jiron raised "no complaints of eye pain" from June 8, 2015 to the present, *i.e.*, January 10, 2017. ECF 10-5, Clem Aff., ¶ 18.

[11] Exophthalmos is the abnormal protrusion of the eyeball. *See* http://medical-dictionary.thefreedictionary.com/exophthalmos.

## II. Standard of Review

The Medical Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When, as here, the movant expressly captions its motion "in the alternative," as one to dismiss or for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[12]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule

---

[12] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165-67.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a

9

genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit …is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary," and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

In his Opposition, plaintiff asks that he be permitted to conduct discovery so that the court may consider this case on a full record. ECF 19 at 1. But, Galvan Jiron does not indicate what discovery he wishes to obtain, what records are missing, nor does he discuss how the absence of discovery renders him unable to respond to the Medical Defendants' exhibits. In light of the relevant medical record and affidavits submitted to the court, I am satisfied that it is

appropriate to address the Medical Defendants' Motion as one for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id*. at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199,

2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III. Discussion

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison

staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual

14

knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), resonates here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Moreover, if a risk is obvious, a prison official "cannot hide behind an excuse that he was

15

unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official's "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

Even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

In essence, the treatment rendered must be so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted) (*overruled in part on other grounds by Farmer,* 511 U.S. at 837. But, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and

medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

In his Opposition, Galvan Jiron complains that as a Latino male of Honduran decent, he understood very little and was not provided an interpreter when it came to court and medical issues. ECF 19.[13] He contends that every time he tried to obtain a specialist referral to be examined and have his pain level measured, Dr. Clem "deflected" him by having non-physicians examine and treat him. Galvan Jiron argues that it is the policy of Wexford and Clem to avoid personal contact with inmates to avoid liability. Moreover, he complains that he did not receive an eye patch or eye drops in a timely manner, as they were not provided to him until two weeks after they were ordered following the excision of the pterygium growth in his right eye in June 204. ECF 19.

A review of the pleadings and accompanying exhibits belies plaintiff's claim under the Eighth Amendment for deliberate indifference with regard to his medical care. The medical record reveals that Galvan Jiron's eye condition was evaluated and he was found to have a growth or pterygium on his right eye. The pterygium was surgically removed at a hospital and he received post-surgical follow-up evaluation from the surgeon, who found Galvan Jiron's eye to be healing well. Further, Galvan Jiron was seen by prison medical staff, including nurses,

---

[13] Galvangiron appears to complain that, due to his minimal understanding of the English language, he requires an interpreter to plead in this court and when receiving medical care. Notwithstanding this eleventh hour claim, the medical and court records generally suggest otherwise. But *see* ECF 20-2 at 2. Galvangiron's pleadings and sick-call slips show that he is able to litigate his case and to grieve his medical claims without the assistance of an interpreter.

17

doctors, and optometrists, and his post-surgical vision improved to almost normal with corrected lenses.

Unfortunately, Galvan Jiron did not receive his eye drops and eye patch until two weeks after his surgery on June 11, 2014. But, he has failed to demonstrate deliberate indifference due to the delay in providing him with the patch or the eye drops, or that the delay caused him an injury. At most, plaintiff has shown inadvertence or negligence.

### IV. Conclusion

On the record in this case, an Eighth Amendment violation cannot be made. Summary judgment will be entered in favor of the Medical Defendants in a separate Order to follow.


Date:  June 2, 2017                                    _____/s/_____
                                                       Ellen L. Hollander
                                                       United States District Judge